UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
:
LAWYERS TITLE COMPANY, LLC :
: CASE NO. 1:12-CV-2098
Plaintiff, :
:
vs. : OPINION & ORDER
: [Resolving Docs. 65 & 66]
KINGDOM TITLE SOLUTIONS, :
INC., *et al* :
:
Defendants. :
:
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this business dispute, Lawyers Title Company, LLC, sues its smaller competitor Kingdom Title Solutions, Inc., and two former Lawyers employees, Sarah Bittinger and Deborah Fattaroli, for losses allegedly incurred when Bittinger and Fattaroli resigned from Lawyers and began employment at Kingdom. While the Court finds no evidence to suggest tortious actions by Kingdom, the Court finds sufficient evidence to raise triable issues regarding the actions of the former employees in potentially diverting transactions from Lawyers to Kingdom while still in Lawyers's employ. Accordingly, the Court **GRANTS** Kingdom's motion for summary judgment and **GRANTS IN PART** and **DENIES IN PART** the former employees' joint motion for summary judgment.

**I. Background**

This lawsuit arises from the June, 2012, unraveling of Lawyers's Medina, Ohio, title insurance sales office. Prior to June 2012, Defendants Sarah Bittinger and Deborah Frattaroli worked to sell and service title insurance on behalf of Lawyers.[1] In June of 2012, Brian Moore, the

---

[1] [Doc. 67-11 at 24-25.]

Case No. 1:12-CV-2098
Gwin, J.

president of Kingdom Title, a competitor to Lawyers, approached Bittinger and offered her an ownership interest in a to-be-created Kingdom office in Medina, Ohio.[2] He offered to hire Frattaroli as well.[3] Both Bittinger and Frattaroli accepted Kingdom's offer on June 7, 2012.[4] But before their departure on June 22, 2012, Bittinger worked with Kingdom on several title-insurance transactions that might otherwise have been handled by Lawyers. Lawyers now seeks recompense.

Testimony indicates that title insurance services are substantially similar across the industry.[5] Like attorneys, title insurance salespeople often have a client base who will follow them from employer to employer. Customers look for service and service is more directly associated with employees rather than with title insurance underwriters.

Against this backdrop, a title insuance business could seek to negotiate a non-compete agreement as a contract term governing employment. But Plaintiff Lawyer's never obtained any non-compete agreement or non-solicitation agreements from Bittinger and Frattaroli.[6]

Beginning in 2008, Bittinger worked as the manager of Lawyers's Medina, Ohio, title insurance sales office.[7] In that capacity, she managed the logistics of the office and solicited title insurance and escrow service sales from realtors, lenders, builders, attorneys, and consumers.[8]

---

[2] [Doc. 67-11 at 54, 55.]

[3] [Doc. 67-11 at 54, 55.]

[4] [Doc. 67-11 at 56-57.]

[5] [Doc. 67-11 at 22; 66-12 at 1-2.]

[6] [Doc. 66-4, 66-5, 65-2 at 11-12.]

[7] [Doc. 67-11 at 7-8.]

[8] [Doc. 67-11 at 5, 10.]

Case No. 1:12-CV-2098
Gwin, J.

Frattaroli worked as the escrow agent and provided customer service during transactions.[9]

Near April, 2012, Brian Moore, the president of Kingdom Title, approached Bittinger and told Bittinger that Kingdom was "looking to grow."[10] A second meeting followed where Moore offered to hire Bittinger as a sales representative, and Bittinger, in turn, requested that Moore consider hiring Frattaroli.[11] Bittinger soon told Frattaroli about the meeting and also told her that she was considering accepting Kingdom's offer.[12] Frattaroli responded that she wanted to continue working with Bittinger but that she, herself, would not consider leaving Lawyers.[13] Bittinger apparently declined Moore's offer, because another meeting followed in early May at Moore's request.[14] During the May meeting, Moore gave Bittinger a detailed offer of employment, including salary and benefits.[15] Bittinger again represented to Moore during that meeting that she wanted Frattaroli to come to Kingdom as well.[16] Moore agreed that Bittinger could offer Frattaroli a position with Kingdom.[17]

Nonetheless, at a third, subsequent Bittinger and Moore meeting, Bittinger again declined

---

[9] [Doc. 67-11 at 7-8, 26-27.]

[10] [Doc. 67-11 at 32-33.]

[11] [Doc. 67-11 at 34-35.]

[12] [Doc. 67-11 at 39.]

[13] [Doc. 67-11 at 40.]

[14] [Doc. 67-11 at 47.]

[15] [Doc. 67-11 at 48.]

[16] [Doc. 67-11 at 49-50.]

[17] [Doc. 67-11 at 50.]

Case No. 1:12-CV-2098
Gwin, J.

Kingdom's offers.[18] During that meeting, however, Moore offered a new proposal: Bittinger would receive an ownership stake in Kingdom's Medina office.[19] He also authorized Bittinger to offer employment to Frattaroli.[20]

Shortly thereafter, and around June 5-7, 2012, Bittinger again offered Frattaroli a position in the to-be-created Kingdom Medina office.[21] She offered a higher salary than Frattaroli earned at Lawyers and health benefits.[22] Frattaroli accepted.[23] Bittinger then told Connie Carlton, another, lower-ranking, employee in the Lawyers Medina office, that she planned to leave Lawyers for Kingdom and that Moore was hiring for several positions.[24] On June 7, 2012, Moore and Bittinger signed the operating agreement for Kingdom Title's Medina office.[25] The agreement gave Bittinger an ownership stake in the office.[26] With this lawsuit, Lawyers says that Bittinger's communications with Frattaroli and Carlton about Kingdom violated duties that she owed to Lawyers.

Lawyers also generally complains that Bittinger and Frattaroli wrongly diverted several contracts to Kingdom while still employed by Lawyers. Bittinger continued working for Lawyer's for two weeks after signing the agreement. While remaining in Lawyers's employ until June 22,

---

[18] [Doc. 67-11 at 51.]

[19] [Doc. 67-11 at 52.]

[20] [Doc. 67-12 at 3-4.]

[21] [Doc. 67-11 at 55, 72-73.]

[22] [Doc. 67-11 at 55.]

[23] [Doc. 67-11 at 55.]

[24] [Doc. 67-11 at 56-57.]

[25] [Doc. 67-4.]

[26] [Doc. 67-4.]

Case No. 1:12-CV-2098
Gwin, J.

2012, Bittinger had contact with Lawyers's customers who arguably later went to Kingdom. Lawyers says was Bittinger diverted contracts that Lawyers claims belonged to it. Lawyers cites five sets of Bittinger's communications that it says wrongfully interfered with its business relationships.

First, on June 14, 2012, Bittinger sought a Kingdom sales contract for a developer apparently selling his personal home.[27] Second, Lawyers complains that through a series of communications between May 29, 2012 and June 19, 2012, Bittinger passed information to Kingdom on a sales contract on an Avon Lake Road property that the client initially sought to complete through Lawyers.[28] Third, on June 15, 2012, Bittinger communicated with Kingdom and a client about a contract on a Bridgeside Drive property and used Lawyers's title searching staff in support of the transaction.[29] Fourth, on May 30, 2012, and June 18, 2012, Bittinger communicated with clients and Kingdom regarding a property on Benjamin Drive.[30] Finally, on June 22, 2012, Bittinger scanned and emailed to her personal email account a contract for a property on State Route Forty-Three.[31]

For its part, Kingdom denies knowing that some of its transactions had initially opened at Lawyers.[32]

Lawyers argues that based on this evidence, a jury could find claims for breach of fiduciary

---

[27] [Doc. 67-7.]

[28] [Doc. 67-5; 67-11 at 78-80, 86, 88, 90, 91-95.]

[29] Doc. 67-8; 67-10; 67-11 at 97-99, 103.]

[30] [Doc. 67-11 at 108-09, 111-114.]

[31] [Doc. 67-9; 67-11 at 118-121.]

[32] [Doc. 66-7 at 1.]

-5-

Case No. 1:12-CV-2098
Gwin, J.

duty against Bittinger, breach of loyalty against Bittinger and Frattaroli, tortious interference with contract and with business relations against all three defendants, aiding and abetting tortious interference with business relations against Kingdom, unjust enrichment against Kingdom, and civil conspiracy against all defendants. The employees now move for partial summary judgment on the breach of fiduciary duty and breach of loyalty claims saying that no evidence indicates any breaches of duty before June 6, 2012, or after they left Lawyers's employ on June 22, 2012. They seek full summary judgment on the remaining claims. Kingdom seeks summary judgment on all claims. The Court addresses these claims in turn.

## II. Legal Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[33] As the moving parties, the defendants have the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the Lawyers's case.[34] "A fact is material if its resolution will affect the outcome of the lawsuit."[35] The movant meets its burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[36]

Once defendants satisfy this burden, the burden shifts to Lawyers to set forth specific facts

---

[33] *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).

[34] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[35] *Martingale, LLC v. City of Louisville*, 361 F.3d 297, 301 (6th Cir. 2004).

[36] *Celotex Corp.*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

-6-

Case No. 1:12-CV-2098
Gwin, J.

showing a triable issue.[37] It is not sufficient for the Lawyers to show that there is some existence of doubt as to the material facts.[38] Nor can Lawyers rely upon mere allegations or denials of its pleadings.[39] In responding to a summary judgment motion, Lawyers "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment."[40]

In deciding a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party.[41] "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial."[42] Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[43]

### III. Analysis

As an initial matter, Ohio law controls. A federal district court sitting in diversity applies Ohio law and resolves such a case as it finds the Ohio Supreme Court would. The Court addresses the claims in turn.

---

[37] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[38] *See id.* at 586.

[39] Fed. R. Civ. P. 56(e).

[40] *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989) (internal quotation omitted).

[41] *Thomas v. Cohen*, 453 F.3d 657, 660 (6th Cir. 2004) (citations omitted).

[42] *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

[43] *Martingale*, 361 F.3d at 301.

-7-

Case No. 1:12-CV-2098
Gwin, J.

### A. Count One: Breach of Fiduciary Duty Against Bittinger

Briefing from both parties jumbles together Lawyers's breach of fiduciary duty claim against Bittinger with its breach of duty of loyalty claim against Bittinger and Frattaroli. Lawyers's complaint alleges that the same six actions as the basis for both torts.[44] They assert that Bittinger breached her fiduciary duty by

> (1) improperly solicited Frattaroli and Carlton, and that the Former Employees (2) improperly solicited customers and prospective customers for Kingdom, including LaFaso and Kasper, (3) worked on a number of Kingdom's orders, (4) conspired to leave en masse so that the Medina Office would be left empty, (5) deleted all of their emails and the eDesk database in an effort to leave Lawyers in chaos and prevent Lawyers from performing quick damage control, and (6) informed Lawyers' customers the Medina Office was permanently closing—all while they were still employed by Lawyers.[45]

Before analyzing whether evidence supports these allegations, some clarification is needed. "A 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust."[46] A fiduciary duty comes from a *mutually agreed* understanding. To succeed in such a claim, a plaintiff must cite "facts in support of its allegation that the relationship between [employer and employee] was a fiduciary relationship, characterized by some special competence and trust."[47] Typically, fiduciaries owe a duty of loyalty and a duty of care.[48] In contrast, employees

---

[44] [Doc. 1 at 11, 12.]

[45] [Doc. 67 at 20.]

[46] *Stone v. Davis*, 419 N.E.2d 1094, 1097-98 (Ohio 1981) (further citation omitted).

[47] *Laurel Valley Oil Co. v. 76 Lubricants Co.*, 797 N.E.2d 1033, 1039 (Ohio Ct. App. 2003).

[48] *See Ford v. Brooks*, 2012 Ohio 943, at *2 (Ohio Ct. App. 2012).

-8-

Case No. 1:12-CV-2098
Gwin, J.

typically do not owe their employer fiduciary duties, but only a duty of loyalty.[49/]

Lawyers does not suggest what special trust Bittinger breached beyond the duty of loyalty pled as Count Two of the complaint. Nor, for that matter, does Lawyers give "facts in support of its allegation that the relationship between [Lawyers and Bittinger] was a fiduciary relationship." Although Lawyers will likely be unable to show any fiduciary relationship with Bittinger, Bittinger does not move for summary judgment on the issue of liability for breach of fiduciary duty.[50/] Instead, Bittinger seeks only to narrow the issue to whether her conduct from June 6, 2012 to June 22, 2012 constituted a breach of fiduciary duty and what, if any, damages Lawyers sustained from any breaches during that period.

The Court grants Bittinger the extent of summary judgement that she requests. As all first-year law students learn, the four elements of a tort are duty, breach, causation, and damages. Lawyers's briefing presents no evidence that it suffered any damages from conduct that took place before the June 6, 2012.[51/] Indeed both Bittinger and Frattaroli rejected offers of employment with Kingdom before June 6, 2012.

Nor does Lawyers show any breach of fiduciary duty for Bittinger's actions after June 22, 2012, when she left Lawyers's employment. Lawyers says that Bittinger's "solicitation and recruitment of co-worker's [(sic)] may form the basis for breach of fiduciary duty."[52/] Lawyers "seeks to recover damages Bittinger and Frattaroli caused as a result of their conduct prior to the end

---

[49/]See *Laurel Valley*, 797 N.E.2d at 1039 ("Not all employees are fiduciaries.").

[50/][Doc. 70 at 3 n.1.]

[51/]Lawyers says that "it is well settled [that] the measure of damages is actual damages, including lost profits." [Doc. 67 at 22.] That may be so, but at summary judgment, a plaintiff must still present evidence of actual damages. Lawyers presents no evidence of actual damages from acts occurring before June 6, 2012.

[52/][Doc. 67 at 19.]

-9-

Case No. 1:12-CV-2098
Gwin, J.

of employment."[53] These alleged acts all took place on or before June 22, 2012. Accordingly, at trial, the Court will only entertain evidence that Bittinger's actions from June 6, 2012, until the conclusion of employment on June 22, 2012, breached a fiduciary duty.

The Court pauses here to address a specious argument raised by Lawyers. Lawyers would have this Court hold that if Bittinger breached some fiduciary duty and duty of loyalty to Lawyers by recruiting Frattaroli, then Bittinger is liable for all of Lawyers's lost profits as a result of the move.[54] This suggestion plainly misunderstands the law.

> The law of agency recognizes that even before the termination of a relationship, an agent is entitled to make arrangements to leave and compete. However, the agent cannot properly use confidential information about his existing employer's business, cannot solicit customers for the rival business before the end of employment, and cannot do similar acts in direct competition while remaining at the old employer.[55]

That is, Bittinger and Frattaroli may be liable for any damages caused by solicitation of customers before the end of employment, but not for any lost profits caused simply by the fact of their departure. And even if Bittinger and Frattaroli did solicit customers before the conclusion of their employment with Lawyers, Lawyers will have to prove that these breaches of duty—not just the employees' departure—were the proximate cause of any lost profits. Given Bittinger's and Frattaroli's minimal even arguable referrals, Lawyers faces a near impossible task of showing any recoverable lost profits.

**B. Count Two: Breach of Duty of Loyalty Against Bittinger and Frattaroli**

For similar reasons, the Court grants Bittinger and Frattaroli's motion for partial summary

---

[53][Dioc. 67 at 22.]

[54][Doc. 67 at 22-23.]

[55]*Buckingham, Doolittle & Burroughs, L.L.P. v. Bonasera*, 926 N.E.2d 375, 385 (Ohio Ct. App. 2010).

Case No. 1:12-CV-2098
Gwin, J.

judgment on Count Two, breach of duty of loyalty, which also seeks to narrow the window of allegedly tortious events to June 6, 2012, to June 22, 2012.

Again, Lawyers cites (without the appropriate citations to depositions) six allegedly disloyal acts that Bittinger and Frattaroli committed. It says that

> Bittinger (1) improperly solicited Frattaroli and Carlton, and that the Former Employees (2) improperly solicited customers and prospective customers for Kingdom, including LaFaso and Kasper, (3) worked on a number of Kingdom's orders, (4) conspired to leave en masse so that the Medina Office would be left empty, (5) deleted all of their emails and the eDesk database in an effort to leave Lawyers in chaos and prevent Lawyers from performing quick damage control, and (6) informed Lawyers' customers the Medina Office was permanently closing—all while they were still employed by Lawyers.[56]

All of these alleged acts took place between June 6, 2012 and June 22, 2012. Accordingly, the Court grants defendants' motion for partial summary judgement. At trial, the Court will only entertain testimony regarding disloyal acts between June 6, 2012 and June 22, 2012 and any damages proximately caused by those acts.

Before proceeding to Lawyers's third claim, the Court again pauses to address Lawyers's misleading arguments. Lawyers cites *Buckingham Doolittle & Burroughs, L.L.P. v. Bonasera* as "holding 'it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements.'"[57] The *Buckingham* Court never said that an agreement to leave simultaneously *was* a breach of duty. Instead, it said that such an agreement *could* support a finding of a breach of duty. That case said that "a court *may* find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an

---

[56][Doc. 67 at 20.]

[57][Doc. 67 at 20.]

-11-

Case No. 1:12-CV-2098
Gwin, J.

opportunity to hire and train replacements."[58] Thus that court decided that because of the "innumerable possible rules," jury trial is the appropriate mechanism to determine whether solicitation of coworkers violates fiduciary duty or duty of loyalty.[59] The Court follows that precedent here. The jury will determine whether Bittinger's solicitation of Frattaroli and Carlton violated duties that she owed to Kingdom.

**C. Count Three: Tortious Interference with Lawyers's Contracts**

Lawyers next says that "summary judgment on the tortious interference claims should be denied *ab initio* because [the former employees] admit [that] there are genuine issues of material fact concerning whether they wrongly solicited and transferred orders to Kingdom before June 22."[60] Tortious interference with a contract involves "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages."[61]

Lawyers's claims largely fail at the first element. Lawyers never actually cites a valid contract that was breached. Lawyers identifies five transactions with which it says that defendants interfered: the Avon Lake Road transaction, the Bridgeside Drive transaction, the Benjamin Drive transaction, the developer selling his personal home, and the State Route Forty-Three transaction. With respect to the first transaction, Lawyers says that "[t]he order for that transaction was opened at Lawyers on May 30th" but "ultimately closed at Kingdom with Frattaroli running the deal as the

---

[58] *Buckingham, Doolittle*, 926 N.E.2d at 385(emphasis added) (quoting Restatement of the Law 2d, Agency (1958) § 393 comment e).

[59] *Id.* at 387.

[60] [Doc. 67 at 24.]

[61] *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858(Ohio 1999).

-12-

Case No. 1:12-CV-2098
Gwin, J.

escrow officer."[62] While such a state of affairs indeed sounds disloyal, it does not satisfy the elements for tortious interference with a contract because by Lawyers's admission, the contract did not exist until it closed at Kingdom.

With regards to the developper selling his personal home, Lawyers says that "Bitternger sent an email to Keenan at Kingdom requesting a blank Kingdom sales contract for a *potential* customer who was selling his home."[63] A potential customer, by definition, does not have a contract.

Lawyers similarly says that "when [Realtor Sam LaFaso] was finally prepared to do business with [Bittinger], he sent her a completed sales contract for a property on Bridgeside Drive with Kingdom listed as the title company," just as he did with another property on Benjamin drive.[64] While this evidence may well suggest that Bittinger breached duties of loyalty owed to Lawyers while employed there, it does not show that she interfered with *existing* contracts, because the only completed contract was with Kingdom.

In opposition to Kingdom's motion for summary judgment, Lawyers says that the Avon Lake Road and State Route Forty-Three sales contracts "constituted valid contracts for title and escrow services."[65] First, that Lawyers cites only the Avon Lake Road and State Route Forty-Three transactions in its brief suggests that it acknowledges that there were no valid contracts in the other transactions it cited in opposition to Bittinger and Frattaroli's motions for summary judgment. Second, the June 13, 2012, Avon Lake Road contract lacks the seller's written ascent, thus, by definition, there was no contract with Lawyers, and Lawyers presents no other evidence that a valid

---

[62] [Doc. 67 at 12.]

[63] [Doc. 67 at 12.] (emphasis added)

[64] [Doc. 67 at 13.]

[65] [Doc. 68 at 22.]

Case No. 1:12-CV-2098
Gwin, J.

contract existed.[66]

Among the five allegedly tortious transactions, this leaves only the State Route Forty-Three transaction as a potentially valid contract. But, Lawyers presents no evidence that the State Route Forty-Three transactions did not close at Lawyers aside from its counsel's representations, which are insufficient at summary judgement.[67] As such, Lawyers has presented no contracts that were breached.

And for purposes of Kingdom's motion for summary judgment, even assuming arguendo that these were valid contracts, Kingdom's knowledge that Bittinger was still working at Lawyers does not suffice to show that Kingdom knew that with respect to these two transactions that Lawyers already had these matters under contract. Indeed among the five transactions that Bittinger may have worked on for Kingdom while employed at Lawyers, Lawyers *acknowledges* that more than half of them were not the subject of existing contracts at Lawyers.

Additionally, the Court does not find Kingdom's actions "improper." "[T]he fourth element of the tort of tortious interference with contract, lack of justification, requires proof that the defendant's interference with another's contract was improper."[68] Ohio considers seven factors to determine whether interference is improper:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.[69]

---

[66] [Doc. 67-4 at 4.]

[67] [Doc. 67-11 at 120.]

[68] *Fred Siegel Co.*, 707 N.E.2d at 858.

[69] *Id.* at 860.

-14-

Case No. 1:12-CV-2098
Gwin, J.

Lawyers offers two sentences of incoherent *ipse dixit* analysis on these seven factors. It says that "Kingdom procured these breaches of contract through improper means. Specifically, in transferring these contracts to Kingdom, Bittinger and Frattaroli were breaching their duties to Lawyers in furtherance of the conspiracy with Kingdom to obtain lawyers customers."[70]

While Lawyers's allegation might speak to improper actions by Bittinger and Frattaroli, it does not speak to improper action by Kingdom—it speaks to no actions at all by Kingdom. Summary judgment requires "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to show genuine disputes of material facts.[71] "The court need consider only the cited materials."[72] Considering the cited materials, the Court sees no assertion of allegedly improper conduct by Kingdom to evaluate.

Moreover, considering the social interests in competition involved here, the proximity of Kingdom's conduct to any interference, and the relationship between Kingdom and Lawyers, the Court finds good reason not to impose liability on Kingdom.

The Court grants the parties' motions for summary judgment on the tortious interference with contract claims.

**D. Count Four: Tortious Interference with Business Relations**

Lawyers next says that defendants tortiously interfered with its business relations by

---

[70] [Doc. 68 at 22.]

[71] Fed. R. Civ. P. 56(c)(1)(A).

[72] Fed. R. Civ. P. 56(c)(3).

Case No. 1:12-CV-2098
Gwin, J.

recruiting its staff and soliciting its customers. Tortious interference with a business relation "occur[s] when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another."[73] Lawyers says that Kingdom engaged in such interference by conspiring with Bittinger and Frattaroli to transfer and warehouse order and by conspiring with Bittinger to recruit Frattaroli and Carlton.[74] Lawyers thus concedes that this claim hinges both on the existence of the conspiracy and the individual employees' tortious interference with business relations. The Court will examine this claim momentarily.

The claim against Bittinger, however, is easy. Because Bittinger owed Lawyers a duty of loyalty during the term of her employment, she could not encourage potential Lawyers customers not to engage in business with Lawyers and to instead patronize Kingdom.[75] Bittinger's deposition testimony suggests that while still managing Lawyers's Medina office, she communicated with customers to Kingdom's gain and gave customer information to Kingdom while still at Lawyers. A jury could infer that Bittinger induced these limited number of customers not to continue or enter into a business relations with Lawyers. Accordingly, the Court denies Bittinger summary judgment on Lawyers's tortious interference with business relations claim.

The same cannot be said of Frattaroli. The only evidence that Lawyers cites that Frattaroli induced a person not to enter into a business relationship with Lawyers is that Frattaroli failed to open an order for the State Route Forty-Three property while still in Lawyers's employ.[76] While

---

[73] *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995).

[74] [Doc. 68 at 23-24.]

[75] *See Berge v. Columbus Cmty. Cable Access*, 736 N.E.2d 517, 549 (Ohio Ct. App. 1999) ("[O]rdinarily employees are considered to be in breach of their duty of loyalty if they compete with their employer.").

[76] [Doc. 67-11 at 120-21.]

-16-

Case No. 1:12-CV-2098
Gwin, J.

hardly the act of a competent employee, this act is insufficient to show that Frattaroli induced the client not to follow through with Lawyers. Indeed documents submitted by Lawyers show that Frattaroli, with respect to one order, sought to ensure that customers knew that their orders would complete through other Lawyers offices.[77] Accordingly, the Court grants summary judgment on the tortious interference with business relations claim as to Frattaroli.

The Court will address Lawyers's tortious interference with business relations claim against Kingdom with its civil conspiracy claim.

### E. Count Five: Aiding and Abetting Tortious Interference with Business Relations

Lawyers does not contest that this claim must be dismissed. Ohio does not recognize a tort for aiding and abetting tortious interference with business relations.[78]

### F. Count Six: Unjust Enrichment

Lawyers next claims that Kingdom was unjustly enriched by "Bittinger's breach of fiduciary duty and tortious interference with business relations."[79] "Unjust enrichment of a person occurs when he or she has and retains money or benefits which in justice and equity belong to another."[80] As Lawyers would have it, but for Bittenger's *premature* solicitation of Frattaroli and Carlton, Frattaroli and Carlton would have stayed at Lawyers, and had Frattaroli and Carlton remained at Lawyers, its office profits would have continued at previous rates. This chain of causation is simply too attenuated to withstand summary judgment. Recall, Lawyers had the right to fire Bittenger or Frattorili and Lawyers had not paid for any non-compete or solicitation agreement with Bittenger or

---

[77] [Doc. 67-2 at 3-6.]

[78] *See* DeVries Dairy, L.L.C. v. White Eagle Cooperative Ass'n, Inc., 974 N.E.2d 1194, 1194 (Ohio 2012).

[79] [Doc. 68 at 25.]

[80] *Univ. Hosps. of Cleveland, Inc. v. Lynch*, 772 N.E.2d 105, 117 (Ohio 2002).

-17-

Case No. 1:12-CV-2098
Gwin, J.

Frattorili. Moreover, Lawyers has not presented sufficient evidence that but for Bittenger's *improper* solicitation of Frattaroli, Frattaroli would not have left Lawyers, another break in this purported chain of causation.

While Lawyers might have had a reasonable argument that Kingdom was unjustly enriched by retaining any profits from transactions that Bittinger allegedly diverted to Kingdom while still in Lawyers's employ, it does not make this claim at Summary judgment. The Court grants summary judgment for Kingdom on this claim.

**G. Count Seven: Civil Conspiracy**

Ultimately, Lawyers's claims for much of the following, including its tortious interference with business relations claim against Kingdom, hangs on a finding of civil conspiracy. Lawyers says that because the defendants conspired, damages caused by acts in concert can be assessed against all defendants. Under Ohio law, civil conspiracy is the "malicious combination of two or more persons to injure another person or property, in a way not competent for one alone, resulting in actual damages."[81] Critically, Ohio law requires not just "combination of two or more persons to injure another person" but the "malicious combination" there for. Malice must require something more than mere knowledge, *i.e.* intent to injure.[82]

While a jury might be able to infer from Bittinger's actions that she intended to commit wrongful acts by diverting orders from her current employer, the evidence does not show that either Kingdom or Frattaroli *intentionally* committed any wrongful act.[83] For Kingdom's part, the hiring

---

[81] *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995).

[82] MALICE, Black's Law Dictionary (9th ed. 2009), malice ("The intent, without justification or excuse, to commit a wrongful act. 2. Reckless disregard of the law or of a person's legal rights.").

[83] Indeed Bittinger stated that Frattaroli never worked for the benefit of a competitor while at Lawyers. [Doc. 67-11 at 17.]

-18-

Case No. 1:12-CV-2098
Gwin, J.

of at will employees can hardly be considered wrongful—it is the essence of our economic system. Nor was it wrongful for Kingdom to seek and close transaction that had not yet been finalized at Lawyers. This act was mere economic competition.

Nor has Lawyers explained what wrongful act Frattaroli committed in combination with Bittinger. Even assuming *arguendo* that Bittinger's solicitation of Frattaroli was wrongful, merely listening to the offer, or even accepting it, does not create a combination with the intent to injure in a way not competent for one alone. Indeed, it was not unlawful for Frattaroli to accept the offer of employment at all, even if it Lawyers is somehow able to show that such an offer was wrongful for Bittinger to offer. Nor has Lawyers established that Frattaroli combined with Bittinger to injure Lawyers by impermissibly diverting orders, only that Bittinger did so.

Because Lawyers has shown no evidence of malice by Kingdom or Frattaroli, the Court grants summary judgment for defendants on Plaintiff's claim for civil conspiracy, and thus, by extension, on Lawyers's claim against Kingdom for tortious interference with business relations.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Kingdom's motion for summary judgment. Further, the Court **GRANTS** the employees' motion for partial summary judgment on counts one (breach of fiduciary duty) and two (breach of duty of loyalty) as explained in this opinion, **GRANTS** summary judgment for the employees on counts three (tortious interference with contract) and seven (civil conspiracy), and **GRANTS** summary judgment for Frattaroli on count four (tortious interference with business relations). The Court **DENIES** Bittinger summary judgment on count four (tortious interference with business relations). The Court **DISMISSES** count five (aiding and abetting tortious interference with business relations).

Case No. 1:12-CV-2098
Gwin, J.

    IT IS SO ORDERED

Dated: March 29, 2013          s/ *James S. Gwin*
                                                         JAMES S. GWIN
                                                         UNITED STATES DISTRICT JUDGE