UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
--------------------------------------------------------

LAWYERS TITLE COMPANY, LLC

        Plaintiff,

vs.

KINGDOM TITLE SOLUTIONS,
INC., *et al*

        Defendants.

--------------------------------------------------------

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CASE NO. 1:12-CV-2098

OPINION & ORDER
[Resolving Doc. 133]

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this business dispute, Lawyers Title Company, LLC, sued its smaller competitor Kingdom Title Solutions, Inc., and two former Lawyers employees, Sarah Bittinger and Deborah Frattaroli, after Bittinger and Frattaroli resigned from Lawyers and began employment at Kingdom. The Court granted summary judgment for Kingdom and partial summary judgment for the former employees.[1]

Following trial, a jury assessed $13,028 in damages against Bittinger but found Frattaroli not liable.[2] Bittinger now renews her motion for judgment as a matter of law and asks the Court to reduce the jury's award to $3,263. Because the evidence was sufficient to support the jury's verdict—albeit barely—the Court **DENIES** Bittinger's motion.

**I.**

This lawsuit arises from the June, 2012, unraveling of Lawyers's Medina, Ohio, title insurance sales office. Prior to June 2012, Defendants Sarah Bittinger and Deborah Frattaroli

----

[1][Doc. 81.]

[2][Doc. 128.]

Case No. 1:12-CV-2098
Gwin, J.

worked to sell and service title insurance and title services on behalf of Lawyers.[3/]  In June of 2012,

Brian Moore, the president of Kingdom Title, a competitor to Lawyers, approached Bittinger and

offered her an ownership interest in a to-be-created Kingdom office in Medina, Ohio.[4/]  He offered

to hire Frattaroli as well.[5/]  Both Bittinger and Frattaroli accepted Kingdom's offer on June 7, 2012.[6/]

But before their departure from Lawyers Title on June 22, 2012, Bittinger worked with Kingdom on

several title-insurance transactions that might otherwise have been handled by Lawyers.  Lawyers

sued.

Testimony indicates that title insurance services are substantially similar across the industry.[7/]

Like attorneys, title insurance salespeople often have a client base who will follow them from

employer to employer.  Customers look for service and service is more directly associated with

employees rather than with title insurance underwriters.  Against this backdrop, a title insurance

business could seek to negotiate a non-compete agreement as a contract term governing employment.

But Plaintiff Lawyer's never obtained any non-compete agreement or non-solicitation agreements

from Bittinger and Frattaroli.[8/]

Kingdom moved for summary judgment and Bittinger and Frattaroli, jointly, moved for

partial summary judgment.[9/]  The Court granted summary judgment for Kingdom and partial

---

[3/][Doc. 67-11 at 24-25.]

[4/][Doc. 67-11 at 54, 55.]

[5/][Doc. 67-11 at 54, 55.]

[6/][Doc. 67-11 at 56-57.]

[7/][Doc. 67-11 at 22; 66-12 at 1-2.]

[8/][Doc. 66-4, 66-5, 65-2 at 11-12.]

[9/][Docs. 67, 68.]

Case No. 1:12-CV-2098
Gwin, J.

summary judgment for Bittinger and Frattaroli.[10] The parties proceeded to trial on theories of breach

of fiduciary duty, breach of duty of loyalty, and tortious interference with business relations for

Bittinger and Frattaroli's conduct from June 7 through June 22, 2012. A jury found no substantiated

claim against Frattaroli, but assessed $13,028 in damages against Bittinger.[11]

Lawyers then filed a bill of costs with the Clerk asking the Clerk to tax costs in the amount

of $6,238.40 against Bittinger pursuant to Federal Rule of Civil Procedure 54(d)(1).[12] Kingdom also

filed its own bill of costs, asking the Clerk to tax costs against Lawyers in the amount of $2,558.42.[13]

The Court denied costs to both parties.[14]

Bittinger now moves for renewed judgment as a matter of law.[15] She says that the evidence

of proximate cause presented to the jury only supports damages, in the form of lost profits, for six

transactions.[16] She says that the lost profits total $3,263 and that the Court should reduce the jury's

award accordingly.[17] In response, Lawyers says that the testimony presented to the jury was

sufficient support for the original $13,028 award because the jury could have concluded that Lawyers

suffered damages from the warehousing of orders, transfer of orders to Kingdom Title, cancelling

of open order, deletion of Bittinger's email account and customer database, and solicitation of other

[10][Doc. 81.]

[11][Doc. 128.]

[12][Doc. 134.]

[13][Doc. 137.]

[14][Doc. 141.]

[15][Doc. 133.]

[16][Doc. 133.]

[17][Doc. 133.]

-3-

Case No. 1:12-CV-2098
Gwin, J.

Lawyers employees to depart for Kingdom.[18]

## II.

Federal Rule of Civil Procedure 50(b) provides that:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. . . . [T]he movant may file a renewed motion for judgment as a matter of law. . . . In ruling on the renewed motion, the court may:
> (1) allow judgment on the verdict, if the jury returned a verdict;
> (2) order a new trial; or
> (3) direct the entry of judgment as a matter of law.

"[W]here the Rule 50(b) motion is based on a challenge to the sufficiency of the evidence, a state-law standard of review applies."[19]  Under Ohio law,

> [t]he test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict.  The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion  must be denied. *Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions.*[20]

## III.

The decision on this motion for judgment notwithstanding the verdict is close.  Bittinger

agrees that evidence indicated that while Bittinger was still working at Lawyers, she diverted six

---

[18][Doc. 140 at 6.]

[19]*Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 313 (6th Cir. 2011) *cert. dismissed*, 132 S. Ct. 572 (2011) (quoting *Hartford Fin. Servs. Grp., Inc. v. Cleveland Pub. Library*, 168 Fed. Appx. 26, 30-31 (6th Cir.2006)).

[20]*Osler v. City of Lorain*, 504 N.E.2d 19, 21-22 (Ohio 1986) (quoting *Posin v. A.B.C. Motor Court Hotel*, 344 N.E.2d 334, 338 (Ohio 1976)) (emphasis added in *Osler*).

Case No. 1:12-CV-2098
Gwin, J.

transactions to Kingdom.  She also agrees that these transactions were worth $3,263 in profits, which

she must now pay to Lawyers.  But the evidence supporting a higher award is significantly more

vague.

At trial, Bittinger's former supervisor, Mark Leszczynski, testified as follows:

Q.      Mr. Leszczynski, did you also attempt to figure out, because of the actions
        of Ms. Bittinger in this period, the red period here, what in your opinion
        Lawyers Title's losses would have been for the months of June, July and
        August of '12?

A.      I did. I did.

Q.      And could you briefly explain how you did that?

A.      We looked at the historical information. We looked at the past years, so we
        could assess, you know, the growth in our revenues and apply that in
        2012 . . . .

. . .

Q.      Mr. Leszczynski, in your opinion, what were the amount of damages
        incurred, the lost profits incurred by Lawyers Title for June, July and August
        of 2012?

A.      In June, July and August, by using some conservative estimates, the lost
        profit in those three months, conservatively, were $34,877.

Q.      And why did you use the period, June to August?

A.      June to August is the life of an order. In fact, it is probably too small of a
        window. But we wanted to be conservative. Those orders that are opened in
        June, that should have been opened in June would have generated revenue in
        July, would have generated revenue in August, and probably would have
        generated revenue in September, October, and even beyond. But we wanted
        to be conservative. We wanted to look at the immediate two-month window,
        and we applied an average fee per file. We applied a conservative profit
        margin, and it gave us the number that it gave us.[21]

---

[21][Doc. 131 at 238.]

Case No. 1:12-CV-2098
Gwin, J.

As Lawyers would have it, the jury attributed some of this lost profit to Bittinger's tortious actions. And Bittinger apparently agrees that "Lawyers Title's loss of business could have resulted from several things, among them, Bittinger's alleged wrongful acts during the time period, or Bittinger's labor and diligence following her employment with Lawyers when she was entitled to freely compete."[22]

The Court agrees as well, and, therefore, must deny Bittinger's motion. The jury could have concluded that some portion of those lost profits was attributable to other tortious conduct by Bittinger, such as warehousing of orders or comments she made encouraging customers not to do business with Lawyers while she was still employed there. Still, the Court also agrees with Bittinger that this chain of causation is exceedingly tenuous, and, more likely, Lawyers's lost profits resulted from losing all of the employees in its Medina office—employees who were free to leave and compete because Lawyers employed them "at will," and did not pay a premium for non-compete agreements. Absent testimony from Lawyers's former customers, it is impossible to know why they took their business elsewhere. But Lawyers did not call its former customers to testify, probably because none of them would ever do business with Lawyers again after being dragged into this silly litigation.[23]

Nonetheless, the jury has spoken. And, incredible as the evidence was, it was sufficient to permit the jury to draw the conclusion that it did. The Court need not be able to reproduce the calculation that led to the seemingly arbitrary number of $13,028. But the figure is within the range that the testimony at trial supports, and, so, the Court abides by the jury's determination.

_____

[22][Doc. 142 at 4.]

[23]In all probability, Lawyers has spent tens of thousands of dollars in litigation costs to recover less than $15,000.

Case No. 1:12-CV-2098
Gwin, J.

**IV.**

For these reasons, the Court DENIES Bittinger's renewed motion for judgment as a matter

of law.

IT IS SO ORDERED

Dated: June 14, 2013                          s/          *James S. Gwin*
                                             JAMES S. GWIN
                                             UNITED STATES DISTRICT JUDGE